## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### BROOKLYN COURTHOUSE

| | |
|---|---|
| Akili Charles, individually and on behalf of all others similarly situated, | 1:23-cv-02528 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Church & Dwight Co. Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.    Church & Dwight Co. Inc. ("Defendant") manufactures Arm & Hammer Clean Burst laundry detergent, described as "Powerfully Clean," "Naturally Fresh" and "The Standard of Purity" with an image of a blue cresting wave ("Product").



2.      While traditional "greenwashing" is defined by Earth.org as "mak[ing] [] products appear more environmentally-friendly than they are to gain favor from customers who are trying to help the environment," it is often based on explicit statements about its environmental attributes.

3.      These methods are targeted to "consumers – across all generations – [who] are now willing to pay more for sustainable products" to help protect the environment, according to research group First Insight.

4.      In response to growing scrutiny of these efforts, scholars of consumer and environmental research identified "executional greenwashing" as the "next stage" of telling customers that what they are buying is consistent with these goals.

5.      This was determined by using a modified version of the Means-End Conceptualization of the Components of Advertising Strategy ("MECCAS"), creating a hierarchy for the importance of elements in advertisements.

6.      Schmuck et al. showed that nature-evoking images triggers an "affective persuasive mechanism that appeals to consumers' affinity for nature, [] positively influenc[ing] their evaluations of [goods and services]."

7.      According to Hartmann and Apaolaza-Ibáñez, this kind of imagery evokes positive emotional responses in consumers, and is especially effective when consumers are not particularly knowledgeable and aware of greenwashing methods.

8.      This tactic is evident from how the package's "ecological attributes [] are [] communicated in the background" "[making] use of nature-evoking elements [such as the blue

cresting wave] [] to artificially enhance [its] ecological image."[1]

9.    Despite the cresting blue wave, described as a "Clean Burst," independent testing from Bureau Veritas in 2022 discovered 4.28 parts per million ("PPM") of 1,4-Dioxane ("dioxane"), a heterocyclic organic compound, formed from the addition of ethylene oxide.



10.    As detergent based on the well-known Arm & Hammer Baking Soda, the label describes the Product as being "The Standard of Purity," "appreciated by consumers today who value alternatives to products with harsh chemicals or those which may harm the environment."[2]

11.    However, in light of containing 4.28 ppm dioxane, this representation is misleading, because the Centers for Disease Control and Prevention ("CDC") concluded this chemical is "an impurity in [] household and industrial detergents, [] due to its occurrence as a by-product in ethoxylated emulsifiers."

12.    Despite the claim to purity, "Clean Burst" and bright blue wave, nowhere on the

---

[1] Gephart, Jessica, Mary Emenike, and Stacey Lowery Bretz. ""Greenwashing" or Green Advertising? An analysis of print ads for food and household cleaning products from 1960-2008." Journal for Activist Science and Technology Education 3.2 (2011); Parguel, Béatrice, Florence Benoit-Moreau, and Cristel Antonia Russell. "Can evoking nature in advertising mislead consumers? The power of 'executional greenwashing'." International Journal of Advertising 34.1 (2015): 107-134.
[2] Arm & Hammer, About Us.

packaging does it disclose the presence of dioxane.[3]

13.    The addition of ethylene oxide reduces the risk of skin irritation caused by the Product's harsh petroleum-based ingredients, like sodium laurel sulfate, before being converted to sodium laureth sulfate and C12-15 alcohols ethoxylated.[4]

14.    According to Kippels, "1,4-Dioxane is only detectable by lab equipment; it's not visible to the naked eye."

15.    The National Institutes of Health ("NIH") and Environmental Protection Agency ("EPA") classify dioxane as a probable human carcinogen, which accumulates in the body over time.

16.    Exposure to dioxane occurs through inhalation, drinking contaminated water and skin absorption, which has been linked to tumors of the liver, gallbladder, nasal cavity, lung, skin, and breasts.

17.    Beyond the risks to human health, dioxane's detection in drinking water is the result of its use in products such as laundry detergents, where the water is washed down the drain into vulnerable aquifers.

18.    Given that standard sewage and septic systems are not designed to filter out dioxane, its "diether structure" and "high solubility makes it a persistent, long-term threat to [] water resources."

19.    According to an environmental advocacy group, "dioxane [] can even accumulate in fish and plants that live in [that] contaminated water," and "resists most forms of biodegradation."[5]

20.    The result of excess dioxane is that parts of New York have water supplies with the

---

[3] Helene Forst, The Poison in Your Laundry, Jan. 31, 2018.
[4] https://www.safecosmetics.org/chemicals/14-dioxane/
[5] The Center for Health, Environment & Justice, 1,4-dioxane.

highest levels of this toxin nationwide, according to the EPA, over 100 times its cancer risk guideline of 0.35 parts per billion ("ppb").

21.    While some water districts in New York have advanced membrane filtration and treatment capabilities to limit dioxane from polluting their water supplies, underprivileged and vulnerable communities, such as the elderly, children, and pregnant women, are at higher risks.

22.    To prevent this harm to communities, New York's legislature has banned laundry detergents with greater than 2 PPM of dioxane as part of "[the] [S]tate's ongoing commitment to protect communities."

23.    To the extent the Product may have taken belated efforts to prevent contamination with dioxane or sought waivers to continue selling it as is, any changes will be unable to reverse or biodegrade the dioxin already present within this State.

<u>Jurisdiction and Venue</u>

24.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

25.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

26.    Plaintiff is a citizen of New York.

27.    Defendant is a citizen of Delaware and New Jersey.

28.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

29.    The members of the classes Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here from thousands of locations including grocery stores, dollar stores, laundromats, convenience stores, warehouse club stores,

drug stores, big box stores, and/or online, across the States covered by Plaintiff's proposed classes.

30. Venue is in this District with assignment to the Brooklyn Courthouse because Plaintiff resides in Kings County and a substantial part of the events or omissions giving rise to the claims occurred here, including her purchase and use of the Product, and her awareness the representations were misleading.

Parties

31. Plaintiff Akili Charles is a citizen of Buffalo, New York, Erie County.

32. Defendant Church & Dwight Co. Inc. is a Delaware corporation with a principal place of business in Ewing, New Jersey, Mercer County.

33. Defendant is a leading consumer goods company and sells detergents under the Arm & Hammer brand.

34. Arm & Hammer has built a reservoir of trust with consumers, and has long been known as "The Standard of Purity."

35. Defendant knew the dangers associated with 1,4-dioxane and the 1,4-dioxane-containing Product, yet engaged in executional greenwashing with invocations of purity and ocean waves.

36. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at one or more stores of the type where people buy detergent, such as dollar stores, grocery stores, drug stores, or laundromats, between 2021 and 2023, and/or among other times.

37. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $4.25 per 50 OZ (1.47 L), excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be

sold for absent the misleading representations and omissions.

38.    Plaintiff bought the Product at or exceeding the above-referenced price.

39.    Plaintiff paid more for the Product than she would have paid had she known that despite reading "The Standard of Purity," "Clean Burst," "Naturally Fresh" and seeing the picture of the blue wave, it contained high levels of dioxane, a toxic chemical which is incompatible with those representations, because of its effects on the health of humans and the environment.

40.    Plaintiff expected the Product was free of toxins and components that could have a harmful effect on her, her clothes, and the environment.

41.    Plaintiff was unable to learn the Product contained high levels of dioxane because she was not a chemist and it was not listed on the package.

42.    The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

43.    Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes and/or components.

Class Allegations

44.    Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following class:

> **New York Class**: All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Mississippi, Idaho, Montana, Nebraska, South Dakota, Oklahoma and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

45.    Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

46.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

47.    Plaintiff is an adequate representative because her interests do not conflict with other members.

48.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

49.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

50.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

<u>New York General Business Law ("GBL") §§ 349 and 350</u>
<u>(New York Class)</u>

51.    Plaintiff incorporates by reference all preceding paragraphs.

52.    Plaintiff was taken in by the package's "executional greenwashing," based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware the Product contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its detrimental effects on the health of humans and the environment.

53.    Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>
<u>(Consumer Fraud Multi-State Class)</u>

54.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or

deceptive business practices in the conduct of commerce.

55.    The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

56.    Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

Breaches of Express Warranty,<br>
Implied Warranty of Merchantability/Fitness for a Particular Purpose and<br>
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq</em>.

57.    The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that its use would not be harmful to her, her clothes and the environment, based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware the Product contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its detrimental effects on the health of humans and the environment.

58.    Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

59.    Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

60.    The representations were conveyed in writing and promised the Product would be defect-free, and Plaintiff understood this meant that its use would not be harmful to her, her clothes and the environment, based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware the Product contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its

9

detrimental effects on the health of humans and the environment.

61.    Defendant affirmed and promised that the Product's use would not be harmful to her, her clothes and the environment, based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware it contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its detrimental effects on the health of humans and the environment.

62.    Defendant described the Product so Plaintiff and consumers believed its use would not be harmful to her, her clothes and the environment, based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware it contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its detrimental effects on the health of humans and the environment, which became part of the basis of the bargain that it would conform to its affirmation and promises.

63.    Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

64.    This duty is based on Defendant's outsized role in the market for this type of product, custodian of the Arm & Hammer brand, known for decades as a staple of American households.

65.    Plaintiff recently became aware of Defendant's breach of the Product's warranties.

66.    Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties.

67.    Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

68.    The Product did not conform to its affirmations of fact and promises due to

Defendant's actions.

69.    The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on its packaging, container, or label, because it was marketed as if its use would not be harmful to her, her clothes and the environment, based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware it contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its detrimental effects on the health of humans and the environment.

70.    The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected its use would not be harmful to her, her clothes and the environment, based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware it contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its detrimental effects on the health of humans and the environment, and she relied on Defendant's skill or judgment to select or furnish such a suitable product.

Fraud

71.    Defendant misrepresented and/or omitted the attributes and qualities of the Product, that its use would not be harmful to her, her clothes and the environment, based on the picture of the blue wave and the statements, "The Standard of Purity," "Clean Burst" and "Naturally Fresh," and was unaware it contained high levels of dioxane, a toxic chemical incompatible with those same natural elements, because of its detrimental effects on the health of humans and the environment,

72.    Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

73.    Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary, statutory and/or punitive damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:    April 3, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com